**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Prime Core Technologies Inc., *et al.*,[1] | ) | Case No. 23-11161 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| PCT Litigation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 24-_____ (JKS) |
| v. | ) | |
| | ) | |
| GTH-Trade Group Kft; and Melp | ) | |
| Corporation s.a., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

## COMPLAINT

The PCT Litigation Trust ("Plaintiff" or "Prime")[2] established in the above-captioned

chapter 11 cases (the "Chapter 11 Cases") files this complaint (the "Complaint") against

Defendants GTH-Trade Group Kft. ("GTH-Trade") and Melp Corporation s.a. ("Melp")

(collectively, GTH-Trade and Melp are referred to herein as "Defendants"), pursuant to sections

547, 548, and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code"), seeking to avoid and recover all preferential and/or constructive fraudulent transfers of

---

[1]   The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]   The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors. For purposes of this Complaint, we refer to the Debtors and PCT Litigation Trust collectively as "Prime" unless otherwise specified.

property made by the Debtors to or for the benefit of Defendants plus interest, attorneys' fees, and costs.  To the extent that Defendants have filed a proof of claim or have a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or have otherwise requested payment from the Debtors or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff's right to object to any of such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) though (j) ("Section 502"), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by Plaintiff herein as further stated in Count IV below.  Prime alleges as follows:

## **INTRODUCTION**

1.       Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat, which is commonly referred to as an "on-and-off ramp."  The Nevada Financial Institutions Division ("Nevada FID") shut down Prime in June 2023 and Prime filed for bankruptcy shortly thereafter in August 2023.  Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them.  But Prime transferred $9,913,104.14 U.S. dollars ("USD") it owed to Defendants in the 90-day period prior to the filing of the Chapter 11 Cases.[3]  Pursuant to sections 547 and 550 of the Bankruptcy Code, transfers from Prime to or for the benefit of the Defendants of not less than $9,182,553.49 USD during the Preference Period

---

[3]     Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period occurred between May 16, 2023 and the Petition Date (the "Preference Period").

(the "Preferential Transfers")[4] must be returned.  In the alternative, pursuant to sections 548 and 550 of the Bankruptcy Code, transfers from Prime to or for the benefit of the Defendants of not less than $9,913,104.14 USD (the "Constructive Fraudulent Transfers") must be returned.

2.     GTH-Trade engaged Prime for over-the-counter ("OTC") trading services beginning in 2021.  In May 2023, Prime terminated its relationship with GTH-Trade after learning that GTH-Trade was operating without required licenses.  GTH-Trade's CEO and founder, Jerry Lopez Rodriguez ("Mr. Rodriguez"), established a new company, Defendant Melp, to succeed GTH-Trade so it could continue to use Prime's services.  Melp was founded and owned by Mr. Rodriguez and designed to provide essentially the same services as GTH-Trade.

3.     Defendants engaged Prime to serve as an "on-and-off ramp" and "payment rail".

4.     Specifically, Defendants transferred fiat and crypto to Prime (the "on ramp"). Prime then held and controlled the assets until either: (i) Defendants instructed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on behalf of and pursuant to Defendants' directions for a fee (the "payment rail"); or (ii) Defendants withdrew the value of certain fiat and crypto that Defendants previously had transferred to Prime (the "off ramp").

5.     The agreements that governed Prime and GTH-Trade's relationship during the Preference Period were: (i) Prime Trust Order Form, effective April 1, 2022 (the "GTH-Trade Order Form")[5]; (ii) Prime Trust Master Services Agreement, revision date November 12, 2021

---

[4]    The amount of the Preferential Transfers is based on reasonable due diligence in the circumstances of the case and account for Defendants' known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c), including the new value defense.  Prime has reviewed all of Defendants' transaction activity during the course of the Parties' relationship.  Further details surrounding the Preferential Transfers are provided in the Brennan Decl. *See* Ex. G, Brennan Decl., ¶¶ 57–74.

[5]    A copy of the GTH-Trade Order Form is attached as Exhibit A.

(the "November 2021 MSA");[6] and (iii) Service Schedule for Prime Trust Custodial Services, revision date February 1, 2022 (the "February 2022 Custodial Agreement")[7] (collectively, the "GTH-Trade Agreements").  The agreements that governed Prime and Melp's relationship during the Preference Period were: (i) Prime Trust Order Form, effective June 1, 2023 (the "Melp Order Form")[8]; (ii) Prime Trust Master Services Agreement, revision date August 30, 2022 (the "August 2022 MSA")[9]; and (iii) Service Schedule for Prime Trust Custodial Services, revision date May 13, 2022 (the "May 2022 Custodial Agreement")[10] (collectively, the "Melp Agreements"). The GTH-Trade Agreements and the Melp Agreements are collectively referred to herein as the "Agreements").

6.       Although Prime was a Nevada state-chartered trust company, Defendants never sought or received any trust or fiduciary services from Prime.

7.       The Agreements make clear that no fiduciary relationship existed between Prime and the Defendants (collectively, the "Parties").

8.       The November 2021 MSA and the August 2022 MSA (collectively, referred to herein as the "MSA") explicitly state that "The Agreement **does not create a . . . fiduciary or employment relationship between the parties**." Ex. B, November 2021 MSA, § 14.1 (emphasis added); Ex. E, August 2022 MSA, § 14.1 (emphasis added).

9.       The February 2022 Custodial Agreement and the May 2022 Custodial Agreement (collectively, referred to herein as the "Custodial Agreement") state Prime was entitled to "**pledge,**

---

[6]    A copy of the November 2021 MSA is attached as Exhibit B.

[7]    A copy of the February 2022 Custodial Agreement is attached as Exhibit C.

[8]    A copy of the Melp Order Form is attached as Exhibit D.

[9]    A copy of the August 2022 MSA is attached as Exhibit E.

[10]   A copy of the May 2022 Custodial Agreement is attached as Exhibit F.

*repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such*

*[assets]. . . with all attendant rights of ownership and without any obligation to maintain in its*

*possession or control a like amount of cash or Fiat Currency[.]*" Ex. C, February 2022 Custodial

Agreement, § 2.7(b) (emphasis added); Ex. F, May 2022 Custodial Agreement, § 2.7(b) (emphasis

added).

10.     The MSA and Custodial Agreement establish that the Parties maintained a debtor-

creditor relationship.

11.     The fiat that Defendants transferred to Prime was held in "omnibus" bank accounts

in Prime's name.  These bank accounts commingled the fiat Defendants transferred to Prime with

fiat from Prime's many other customers and Prime's own fiat generated from its business

operations.

12.     Prime attempted to keep track of Defendants' (and other customers') commingled

fiat with an internal, omnibus general ledger (the "Ledger").  But that Ledger was errantly and

later intentionally corrupted by Prime.

13.     Current and former Prime employees have admitted under oath that the Ledger

includes false information and falsified entries.  Accordingly, the Ledger cannot be relied on to

trace the fiat Defendants transferred to Prime.

14.     The third-party expert retained by Prime in this matter, James P. Brennan, also has

confirmed that it is impossible to identify or trace the fiat Defendants transferred to Prime from

fiat provided by Prime's other customers and fiat generated from Prime's business operations.  *See*

Declaration of James P. Brennan (the "Brennan Decl.").[11]

---

[11]     A copy of the Brennan Decl. is attached as Exhibit G.

15.     Blockchain data and bank account statements confirm that the fiat transferred to the Defendants during the Preference Period was not the original fiat that Defendants had transferred to Prime.  Rather, these transfers were fiat that came from the omnibus bank accounts which held the commingled fiat.

16.     In December 2022, Prime discovered it was unable to access a physical hardware digital wallet (the "98f Wallet")[12] holding 11,081 ETH that had been transferred to that wallet by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.

17.     Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests.  To fund those market purchases, Prime used fiat from its omnibus bank accounts that contained commingled fiat from Prime's many customers.

18.     Prime executives admitted that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases.  To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Ledger to make it appear that Prime received fiat wire transfers from the liquidity provider who sold Prime the replacement ETH.  In fact, no such fiat wire transfer deposits ever occurred:



---

[12]    The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f".

A:      

Q:

A:

Deposition of _____, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "___ Dep."), 164:22–165:10 (emphasis added).

19.    Prime's use of fiat it had received from many of its customers to purchase ETH and cover the aforementioned ETH transfers left it with a nearly $82 million shortfall in its bank accounts that contained the commingled fiat that had been transferred to Prime by Defendants and other Prime customers.

20.    Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its internal Ledger, have resulted in Prime being unable to trace fiat currency to any specific deposits, withdrawals, or transfers that were made by any particular customer.

21.    Prime's Preferential Transfers to Defendants exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

22.    Prime's Preferential Transfers to Defendants also gave Defendants an unfair advantage over Prime's many other creditors that did not, or could not, execute similar transactions to recover their assets.

23.    Because the Parties' relationship was strictly a debtor-creditor relationship, the Preferential Transfers were transfers of estate property that must be returned to the Debtors' estate pursuant to Sections 547 and 550 of the Bankruptcy Code.  Accordingly, Prime seeks to recover

the Preferential Transfers of not less than $9,182,553.49 USD from Defendants, plus interest, attorneys' fees, and costs.  In the alternative, Prime seeks to recover the Constructive Fraudulent Transfers of not less than $9,913,104.14 USD from the Defendants, plus interest, attorneys' fees, and costs, pursuant to sections 548 and 550 of the Bankruptcy Code.

## PARTIES

24.    Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the "Effective Date").[13]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id.*, § 1.118.

25.    Defendant GTH-Trade is a Hungarian company[14] and maintains an address in Woodland Hills, California.

---

[13]    *See* Docket No. 694.

[14]    A "Kft." Is a Hungarian limited liability company that bears unlimited liability towards its creditors with its own assets.

26.     Defendant Melp is a Panama-based corporation. Melp maintains a registered address and is headquartered in Panama City.

27.     In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 539] (the "Plan Supplement"), Prime identified preference claims against Defendants as "Exempted Preference Claims", and thus, these claims were not released on the Effective Date of the Plan.[15]

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code. Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c). This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust." *Id.*, §§ 12(s), (u). As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

29.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2). The Court may enter final orders in connection with the matters contained herein.

---

[15]   Prime filed the Plan Supplement under seal.  [*See* Docket No. 539.]  Prime reserves its right to maintain the confidentiality over the remainder the "Exempted Preference Claims" identified in the Plan Supplement.

30.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Prime confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

31.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

32.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

33.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

34.     All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency. All transactions are recorded on the blockchain and are publicly available. When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks." Those "blocks" are publicly available and reflect all cryptocurrency transactions that

occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

35.     There are many different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

36.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

37.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

38.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

39.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

40.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

41.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method.  These types of physical hardware devices are provided by companies such as Trezor:



42.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to effectuate transactions in the crypto kept on the digital wallet.  Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

43.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" address, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet address.

## GENERAL ALLEGATIONS

### A.     Prime's Business Operations

44.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

45.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

46.     In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

47.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining the state money-transmitter licenses (each, an "MTL") required to conduct money transmission.

48.     Prime attempted to solve this issue by offering crypto companies what is commonly known as "money-transmission-as-a-service"—serving as an "on-and-off ramp" and "payment rail" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

13

49.     Crypto companies were able to gain access to the U.S. banking system by using Prime and its banking relationships, thus avoiding having to expend the time, effort, and financial resources needed to obtain their own MTLs.

50.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

**B.     GTH-Trade Engaged Prime for OTC Trading Services**

51.     In 2021, Mr. Rodriguez engaged Prime to provide "OTC trading opportunities" for GTH-Trade and to "trade mostly USDC to fiat USD":



52.     Specifically, GTH-Trade would transfer fiat and crypto to Prime. Prime would then hold and control those assets until either: (i) GTH-Trade directed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on behalf of and pursuant to GTH-Trade's directions for a fee; or (ii) GTH-Trade withdrew certain fiat and crypto it had previously transferred to Prime.

14

53.    Prime required its customers to provide licenses for each jurisdiction in which it operated or otherwise to provide a legal opinion indicating why licensing was not required.

54.    GTH-Trade and Prime's relationship lasted until May 2023 when Prime made a "risk-based decision" to terminate the relationship because GTH-Trade had been operating without licenses:



55.    In June 2023, Mr. Rodriguez requested a one-month extension before the GTH-Trade Agreements would be terminated to ensure customer continuity while GTH-Trade's integration into Melp was taking place.  Prime granted the extension but emphasized that, because

15

of GTH-Trade's lack of proper licenses, its integration into Melp needed to be complete within the month.



## C.    GTH-Trade Changed Its Name to Melp and Incorporated a New Entity in Panama

56.    GTH-Trade changed its name to Melp and incorporated a new entity in Panama.



57. Melp operated as a platform in which customers could exchange and invest crypto. *See Services*, Melp Corporation, S.R., https://melpcorp.com/services/. Like GTH-Trade, Melp provided itself and its customers an on-and-off ramp for fiat and crypto as well as payment rails to remit payments to third-party suppliers.

58. Prime considered Melp to be an "existing customer" because Melp was created and incorporated in Panama to continue the same business activities as GTH-Trade without having to satisfy the same licensing and regulatory requirements that had been required of GTH-Trade.



MELP API is Closed Won with a $57,000.00 ACV
Professional Services Amount: $9,000.00

Melp corporation s.a.
none
Use Case: Other
Use Case Description: Melp is formerly known by GTH trade (GUI account) .
Compliance requested we end our relationship with GTH and to set up an API
agreement with the new entity.
I was able to secure 3 months prepay plus implementation fee. $4,000 for 3 months
prepay. $5,000/month for 9 months. Previous monthly fee of $2500/mo.
Compliance has conditionally approved for US and Panama. Kudos for Compliance
for helping Melp to get the conditional approval. ████████ and ████

████████ let's celebrate!

59. Mr. Rodriguez sought a seamless a transition from GTH-Trade to Melp so as to not impact client activities. As demonstrated in the below communication from May 2023, Mr. Rodriguez was concerned that Prime's termination of its relationship with GTH-Trade would have a negative impact on GTH-Trade's clients while it was undergoing the transition to Melp:



| Organizer: | ██████@primetrust.com ; ██████@primetrust.com |
|---|---|
| Subject: | Melp implementation concerns |
| Location: | |
| Start Time: | 2023-05-23T12:45:00-07:00 |
| End Time: | 2023-05-23T13:15:00-07:00 |
| Attendees: | ████████████████████████████████ |

Hello All,

I had a meeting with Jerry (GTH Trade /MELP) today. He is willing to sign a new MSA but he has concerns about implementation duration and because GTH Trade is in the process of termination. He is concerned about his clients impact. This meeting is to discuss implementation duration and Compliance termination letter.

thanks,

████████

60.    Consistent with his desire for a seamless transition and integration, Mr. Rodriguez agreed to and signed a new MSA—*i.e.*, the August 2022 MSA—on behalf of Melp for purposes of, and with the intent to, continue GTH-Trade's business with Prime under the new Melp name.

61.    Just as Prime did not maintain a separate, segregated account for GTH-Trade, Prime did not create or maintain a separate, segregated account for Melp. The Melp customer name was simply a change of name in Prime's internal systems and Ledger. All GTH-Trade and Melp transactions were recorded in Prime's Ledger under the single customer name, "GTH-Trade Group KFT" (hereinafter "GTH-Trade Group").[16]  *See* Ex. G, Brennan Decl., ¶ 58.

62.    Melp's standard terms and conditions of sale to customers also listed "sales of goods and services by GTH-Trade [G]roup":

---

[16]   Prime would sometimes colloquially use the word "account" to refer to a customers' name and number on the Ledger. However, fiat transferred to Prime was held in commingled, omnibus bank accounts in Prime's name – not segregated customer accounts.



## STANDARD TERMS AND CONDITIONS OF SALE

All sales of goods and services by GTH Trade group. (the "Company") to you (the "Customer") are subject to the terms and conditions set forth hereinbelow, and these terms and conditions are hereby incorporated into each quotation, proposal, purchase order, sales order, invoice and similar document related thereto (collectively, an "Order"):

63.     Just like GTH-Trade, Melp would transfer fiat and crypto to Prime and Prime would perform funds processing and KYC services.  Prime would hold and control the assets until either: (i) Melp instructed Prime to transfer fiat, or convert crypto to fiat for transfer, to others on behalf of and pursuant to Melp's directions for a fee; or (ii) Melp withdrew the value of certain fiat and crypto Melp previously had transferred to Prime.

**D.     The Parties' Agreements**

64.     The Agreements governed the Parties' relationship during the Preference Period.

65.     At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* Ex. B, November 2021 MSA, § 13.1; Ex. E, August 2022 MSA, § 13.1 ("The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

66.     Prime and GTH-Trade executed the GTH-Trade Order Form, effective April 1, 2022.  *See* Ex. A, GTH-Trade Order Form.

67.     Prime and Melp executed the Melp Order Form, effective June 1, 2023.  *See* Ex. D, Melp Order Form.

68.     Both the GTH-Trade Order Form and the Melp Order Form incorporate the MSA and the Custodial Agreement by reference:  "This Order Form is governed by the Prime Trust

Master Services Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference." *See* Ex. A, GTH-Trade Order Form; Ex. D, Melp Order Form.

69.     Both the GTH-Trade Order Form and the Melp Order Form state that the MSA and the Custodial Agreement "shall supersede and replace any prior agreement(s) that may be in place between [Defendants] and Prime Trust with respect to Prime Trust's services." *See* Ex. A, GTH-Trade Order Form; Ex. D, Melp Order Form.

**E.     The Agreements Make Clear that the Parties' Relationship was Strictly a Debtor-Creditor Relationship**

70.     The Agreements make clear that the Parties had a strictly debtor-creditor relationship.

71.     The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and Defendants.

72.     Both versions of the MSA state: "The Parties are independent contractors. The Agreement does **not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties**" and that "**nothing in the Agreement, express or implied is intended to give rise to any third-party beneficiary**." Ex. B, November 2021 MSA, § 14.1 (emphasis added); Ex. E, August 2022 MSA, § 14.1 (emphasis added).

73.     Both versions of the Custodial Agreement expressly stated that Prime could:

*[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk*. Without limiting the foregoing, *Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate,*

20

*sell, or otherwise transfer or use any amount of such securities or other assets
with all attendant rights of ownership and without any obligation to maintain in
its possession or control a like amount of cash or Fiat Currency*[.]

Ex. C, February 2022 Custodial Agreement, § 2.7(b) (emphasis added); Ex. F, May 2022 Custodial

Agreement, § 2.7(b) (emphasis added).

74.    The Custodial Agreement also provided that Defendants agreed "any such earnings,

income, or compensation shall be retained by Prime Trust, and no portion of any such earning,

income, or compensation shall be paid to or for customer . . ." *Id.*

75.    The Parties' operative Agreements make clear that the relationship between Prime

and Defendants was, at all relevant times during the Preference Period, strictly a debtor-creditor

relationship.

**F.    Prime Commingled Fiat**

76.    The fiat that Defendants and other customers transferred to Prime was not

segregated into separate bank accounts. *See* Ex. G, Brennan Decl., ¶ 16.  Instead, the fiat was held

in omnibus bank accounts in Prime's name containing fiat other customers transferred to Prime

and fiat that Prime generated from its own business operations. *See id*.

77.    Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("BMO"),

Cross River Bank ("CRB"), and Signature Bank ("Signature"). *See id.* ¶¶ 12.  *See also* Ex. H,

Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and

BMO Harris Bank N.A. (the "BMO Agreement").[17]

78.    The Preferential Transfers to Defendants from Prime were transferred from one of

Prime's accounts at BMO ("BMO x3077").  *See* Ex. G, Brennan Decl., ¶ 62.

---

[17]    A copy of the BMO Agreement is attached as Exhibit H.

79.     The BMO Agreement specifically provides that it "*is not for the benefit of any other person and no other person shall have any rights against [Prime] or [BMO Harris] hereunder*." *See* Ex. H, BMO Agreement, § 15(e) (emphasis added).

80.     The BMO Agreement does not state that the assets transferred by Prime to BMO were held by BMO "in trust for" or "for the benefit of" any party other than Prime. *See* Ex. H, BMO Agreement.

81.     Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided." *See* Ex. I, Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "BMO Certification").[18]

82.     Moreover, Prime regularly transferred fiat between its various bank accounts, further commingling funds. *See* Ex. G, Brennan Decl., ¶¶ 20–26.

83.     For example, Prime used BMO x3077 primarily to make wire transfers. *See id.*, ¶ 21.

84.     BMO x3077 held commingled funds that it regularly received from other Prime bank accounts and from Prime customers. *See id.*, ¶¶ 21–23.

85.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[19] *See id.*, ¶¶ 24-25.

---

[18]   A copy of the BMO Certification is attached as Exhibit I.

[19]   BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion." *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit J, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements). *See* Ex. I, BMO Certification.

86.     Prime would regularly transfer funds into BMO x3077 from BMO x9934 on an as-needed basis to make outgoing wire transfers. *See id.*, ¶ 21.

87.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077. *See id.*, ¶ 26.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds. *Id.*, ¶¶ 22, 26.

88.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature. *See id.*, ¶ 26.

89.     Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests. *See id.*, ¶ 21.

90.     Prime typically made transfers between its bank accounts in round numbers, without reference to any specific transactions. *See id.*, ¶ 27.  This suggests that Prime simply moved funds between its internal bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity. *Id.*

91.     Prime would also transfer funds between bank accounts that were primarily used for Prime's corporate operations and bank accounts that contained assets transferred to Prime by its customers. *See id.*, ¶ 21.

92.     Once in Prime's custody, the Custodial Agreement permitted Prime, "for convenience, [to] take and hold title to Custodial Property or any part thereof in [Prime's] own name with [Defendants'] ownership of Custodial Property segregated on its books and records." *See* Ex. C, February 2022 Custodial Agreement § 2.9; Ex. F, May 2022 Custodial Agreement, § 2.9.

93.     Prime paid some corporate expenses from bank accounts that primarily contained assets transferred to Prime by its customers.  *See* <u>Ex. G</u>, Brennan Decl., ¶ 28.

94.     Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Ledger.  *See id.*, ¶¶ 16–17.

95.     However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Ledger increasingly difficult.  *See id.*, ¶ 19.

96.     ████████████ ("████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Ledger to determine the amounts that Prime owed to its customers:

> Q:     And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

> A:     I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89: 19–25.

97.     Prime maintained substandard reconciliation processes throughout its history, including with respect to its Ledger.  *See* <u>Ex. G</u>, Brennan Decl., ¶¶ 29–40.  This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *Id.*

98.     Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.  *See id.*, ¶ 29.

99.     Former Prime employees testified that Prime commingled assets transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

100.     ▮▮▮▮ testified that "[r]econciliations were not being done in a timely manner." ▮▮▮▮ Dep., 38: 23–24.

101.     ▮▮▮▮▮▮▮▮ ("▮▮▮▮"), Prime's former Chief Financial Officer, testified:

Q:     Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A:     I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ▮▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

102.     ▮▮▮▮ also testified that "[i]t would not surprise" him if customer assets were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15–22.

103.     ▮▮▮▮▮▮▮▮ ("▮▮▮▮"), Prime's former Senior Vice President of Operations and Reconciliations, also testified regarding Prime's reconciliations processes both before and after March 2021:

Q:     When you say it was a problem, what do you mean?

A:     There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

▮▮▮▮ Dep., 19:23–20:5.

104.     ▮▮▮▮ prepared a report for a July 12, 2021 audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general

25

mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

| 2    Finding and Response Summary Matrix | | | | | | |
|------|-----------|------------------------------------|------------|----------|-----------|----------|
| Risk | Reference | Finding | Target | Response | Completed | Verified |
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

105.    Thus, fiat transferred to Prime by the Defendants was inextricably commingled with fiat transferred to Prime by its other customers and fiat generated from Prime's own operations.  *See* <u>Ex. G</u>, Brennan Decl., ¶ 74.  This commingling was further exacerbated by Prime's repeated transfers of funds between bank accounts and Prime's failure to maintain proper tracking and reconciliation processes.  *See id.* ¶¶ 21-40.

## G.    Defendants Cannot Trace the Fiat they Transferred to Prime

106.    Prime held assets transferred to it from customers in an omnibus, commingled manner.  *See* <u>Ex. G</u>, Brennan Decl., ¶ 16.  This approach resulted in Prime's own employees being incapable of determining where any assets transferred by a particular customer were located, as  testified:

26

Q:     And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:     It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:     And what does that mean to you, a client to have an omnibus account?

A:     It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:     And that was done at Prime Trust?

A:     It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:     And do you know who was responsible for those accounts?

A:     I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

███████ Dep., 205:19–207:3.

107.     Another example of the confusion in tracing specific assets that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



108.   responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":



109. ⬛⬛⬛⬛⬛, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which assets and that Prime was "*not able to specify what customer is out the funds due to our omnibus structure*":



110. Because of Prime's commingling of fiat and poor recordkeeping procedures, it is impossible for Prime, Defendants, or anyone else to trace and specifically identify the fiat that Defendants had transferred to Prime.  *See* <u>Ex. G</u>, Brennan Decl., ¶ 74.

**H.   The 98f Wallet**

111.   In December 2021, one of Prime's largest customers ("<u>Customer</u>") requested a transfer of 5,867.71 ETH (worth approximately $23,600,000 at the time) from Prime.  *See id.*, ¶ 42.

112.   In attempting to satisfy Customer's transfer request, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:



113.     Further investigation revealed that, for approximately eight months, Prime had been permitting Customer to transfer significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

114.     Specifically, in December 2021, Prime discovered that Customer had already transferred 11,081 ETH (approximately $44,550,000 at the time) to the 98f Wallet.  *See* Ex. G, Brennan Decl., ¶ 43.

115.     In or around December 2021, Prime discovered that nobody at the company had any knowledge about how to access the 98f Wallet.

116.     It was unclear to those at the company who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet.  Prime also did not possess and could not locate the seed phrases associated with these physical hardware devices.

117.     As such, Prime had no way of accessing the 98f Wallet and the crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

118.     Prime was concerned about the negative impacts and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

119.     To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Customer's transfer requests.  *See id.*, ¶ 44.

120.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, ███████:



Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

121.    Between December 23, 2021 and March 19, 2022, Prime executed eight different purchases of ETH from Liquidity Provider, totaling 23,778 ETH worth $76,367,548.00 USD based on the value of ETH at the time of each respective purchase. *See* Ex. G, Brennan Decl., ¶ 46:

| Date | Cryptocurrency | USD Value as of Purchase Date |
|------|----------------|-------------------------------|
| 12/23/2021 | 3,000 ETH | $11,958,000 |
| 12/31/2021 | 3,250 ETH | $12,158,250 |
| 01/06/2022 | 2,900 ETH | $10,071,700 |
| 01/22/2022 | 1,930.5019305 ETH | $5,000,000 |
| 03/11/2022 | 1,800 ETH | $4,644,000 |
| 03/14/2022 | 3,250 ETH | $8,524,750 |
| 03/15/2022 | 3,000 ETH | $8,043,000 |
| 03/19/2022 | 4,647.22 ETH | $15,967,847.90 |

122.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat from both Prime's customers and revenues generated from Prime's business activities.  *See id.*, ¶ 47.

**I.      Prime Ultimately Corrupted and Falsified its Ledger to Hide Its Actions with Respect to the 98f Wallet**

123.    Executives at Prime made the decision to falsify entries in the Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Customer's withdrawal requests related to the 98f Wallet.

124.    Prime executives discussed how to hide these transactions from auditors at Nevada FID:



125.    ███ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from Liquidity Provider on Prime's Ledger as opposed to externally transferring funds to Liquidity Provider.  *See* ███ Dep., 153:8–13.

126.    Specifically, Prime settled its ETH purchases from Liquidity Provider by "credit[ing]" Liquidity Provider's customer balance at Prime with fiat amounts equivalent to each ETH purchase.

127.    To "credit" Liquidity Provider's fiat balance with Prime, Prime had to input a "contribution" on its Ledger to make it appear as if Liquidity Provider had wired fiat to Prime.  In reality, no funds were moving from one account to another in connection with the ETH purchases.

128.    ███ testified:



███ Dep., 155:11–156:9.

129.    These actions taken by Prime executives resulted in a discrepancy between the

33

amount of fiat reflected on Prime's Ledger and the amount of fiat that Prime held in its bank accounts.  *See id.;* Ex. G, Brennan Decl., ¶ 52.



130.  further testified about Prime's internal "inflat[ed]" Ledger compared to assets in Prime's bank accounts:

Q:

A:

Q:

A:

Q:

A:

Q:

A:

Dep., 144:11–20; 146:7–15.

131. explained that Prime chose to record its purchases of ETH from Liquidity Provider to satisfy the transfer requests of Customer on Prime's Ledger because that approach made it easier for Prime to avoid detection from Nevada FID:

34

Q: ████████████████████████████████████████

A: ███████████ .

Q: ████████████████████████████████████████████

A: ████████████████████████████████████████████

Q: ████████████████████████████████████████████

A: ███████████████████████████

████ Dep. 152:18–153:13.

132.    Prime executives seem to have undertaken efforts to make Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for the Liquidity Provider. *See* <u>Ex. G</u>, Brennan Decl., ¶¶ 48-50.

133.    As demonstrated below, Prime's Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases:



134.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.[20]  *See id.*, ¶ 54.

135.    Prime's Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000 on December 23, 2021 and $12,158,250 on December 31, 2021.  *See id.*, ¶ 55.

136.    These transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days.  *Id.*

137.    However, these incoming wire transfers are not recorded in Prime's bank account statement for December 2021.  *Id.*

138.    The reason for this is simple: these incoming wire transfers never occurred and instead were manufactured by Prime to conceal its use of customer-transferred, commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Customer's transfer requests.

139.    These false accounting entries were confirmed by ███ who also recognized that Prime's bank account statements would not reflect incoming wire transfers shown on Prime's Ledger:

Q:    ████████████████████████████████████
      █████████

A:    ███

Q:    ██████████████████████████

A:    ███

---

[20]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as <u>Exhibit K</u>.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as <u>Exhibit L</u>.



Q:

A:

. . .

Q:

A:

Q:

A:

█ Dep., 164:22–165:10; 166:5–15.

140.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating assets of different customers and assets Prime generated from its business operations.

141.    As such, neither Prime nor Defendants will be able to locate, segregate, or otherwise identify any of the assets that Defendants had transferred to Prime.

**J.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases**

142.    Prime ultimately reported the 98f Wallet issues to Nevada FID between September and November 2022.

143.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

144.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

145.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime. *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/. CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

146.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order"). Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf. Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

147.    The next day, BitGo canceled its acquisition of Prime. One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns

over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/crypto-custody-firm-bitgo-cancels-prime-trust-acquisition/.

148.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.    The Nevada FID Petition directed Prime to cease and desist all retail trust activities.  *Id.*

149.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

150.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its **omnibus customer accounts**."  *Id.* at 6 (emphasis added).

151.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals."  *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)."  *Id.* at 7.

39

152.    On July 14, 2023, the Nevada Court placed Prime under receivership.

153.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

**K.    The Preferential Transfers Are Avoidable**

154.    Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

155.    First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

156.    Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(2).

157.    Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

158.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

159.    Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

160.    Once knowledge of Prime's increasingly precarious financial circumstances became public, Mr. Rodriguez sought to withdraw a significant amount of fiat from Prime.

161.    Prime transferred $9,913,104.14 from Prime's BMO account to Defendants during the Preference Period.  *See* Ex. G, Brennan Decl. ¶ 59.

| GTH - Fiat Preferential Transfers | | | |
|---|---|---|---|
| Date | Currency | Transfer Count | Transfer Amount ($) |
| 5/16/2023 | USD | 8 | $    285,678 |
| 5/17/2023 | USD | 5 | 155,815 |
| 5/18/2023 | USD | 3 | 49,225 |
| 5/19/2023 | USD | 7 | 654,828 |
| 5/22/2023 | USD | 1 | 20,000 |
| 5/23/2023 | USD | 10 | 335,358 |
| 5/24/2023 | USD | 6 | 477,895 |
| 5/25/2023 | USD | 8 | 151,495 |
| 5/26/2023 | USD | 4 | 377,487 |
| 5/31/2023 | USD | 15 | 739,484 |
| 6/1/2023 | USD | 8 | 320,146 |
| 6/5/2023 | USD | 6 | 443,370 |
| 6/6/2023 | USD | 6 | 506,225 |
| 6/7/2023 | USD | 7 | 1,408,103 |
| 6/8/2023 | USD | 6 | 644,906 |
| 6/9/2023 | USD | 2 | 214,955 |
| 6/12/2023 | USD | 6 | 130,055 |
| 6/13/2023 | USD | 3 | 711,000 |
| 6/14/2023 | USD | 4 | 497,800 |
| 6/15/2023 | USD | 1 | 20,000 |
| 6/16/2023 | USD | 1 | 8,440 |
| 6/20/2023 | USD | 14 | 993,580 |
| 6/21/2023 | USD | 7 | 767,260 |
| Total | | | $    9,913,104 |

162.    Defendants transferred $730,550.65 to Prime during the Preference Period.  *See id.*

163.    Thus, the Preferential Transfers to Defendants were $9,182,553.49 USD.  *See id*., ¶ 61.

164.    The Preferential Transfers were transfers of an interest of Prime in property of Prime.

165.    Prime executed the Preferential Transfers during the Preference Period to satisfy the debt Prime owed to Defendants under the Agreements.

166.    The Preferential Transfers were made while Prime was insolvent.

167.    At the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[21]  If not avoided, the Preferential Transfers will enable

---

[21]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

the Defendants to receive more than the Defendants would have received on account of their claim in a hypothetical liquidation under chapter 7 had Prime not made the Preferential Transfers in satisfaction of Prime's antecedent debt to Defendants. *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

168.    Accordingly, the Preferential Transfers to Defendants must be returned. *See* 11 U.S.C. §§ 547(b), 550.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfers, 11 U.S.C. § 547(b)

169.    Prime repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

170.    Prime has conducted reasonable due diligence into the Preferential Transfers, including, *inter alia*, by reviewing the books and records of Prime and other information regarding transaction activity between the Defendants and Prime.

171.    Prime also has conducted reasonable due diligence into the known or reasonably knowable affirmative defenses that Defendants could assert, including Defendants' potential defenses under section 547(c) of the Bankruptcy Code.

172.    The Preferential Transfers to or for the benefit of Defendants totaled $9,182,553.49 USD.

173.    The Preferential Transfers were made on account of a demand by Defendants.

174.    The Preferential Transfers to Defendants were transfers of an interest in property of Prime.

175.    The Preferential Transfers were made for or on account of an antecedent debt owed by Prime before the Preferential Transfers to Defendants were made.

176.    Prime made the Preferential Transfers to Defendants to or for the benefit of Defendants.

177.    At the time of the Preferential Transfers, Defendants were a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code.  Defendants received the Preferential Transfers, or alternatively the Preferential Transfers were made for their benefit.

178.    The Preferential Transfers were made to Defendants during the Preference Period.

179.    At the time of the Preferential Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

180.    If not avoided, the Preferential Transfers would enable Defendants to receive more than Defendants would have received in a hypothetical chapter 7 case had Prime not made the Preferential Transfers.

181.    Defendants have not repaid all or a part of the value of the Preferential Transfers.

182.    Each of the Preferential Transfers constitutes a preferential payment subject to avoidance within the meaning of Section 547(b) of the Bankruptcy Code.

## <u>Count II</u>
### Avoidance of Constructive Fraudulent Transfer, 11 U.S.C. § 548(a)(1)(B)

183.    Prime pleads this cause of action in the alternative and repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

184.    Prime brings this cause of action in the event that the Defendants assert that (i) one or more of the transfers to or for the benefit of Defendants during the Preference Period was made

on behalf of a Debtor other than the Debtors that owed the antecedent debt and/or (ii) one or more

of the transfers to or for the benefit of Defendants was otherwise not on account of an antecedent

debt.

185.   The Constructive Fraudulent Transfers to or for the benefit of Defendants totaled

$9,913,104.14 USD.

186.   The Constructive Fraudulent Transfers were transfers of an interest in property of

Prime and are avoidable as "transfer[s]" within the meaning of Bankruptcy Code section 101(54).

187.   The Constructive Fraudulent Transfers were made to or for the benefit of

Defendants within the two (2) year period preceding the Petition Date.

188.   Prime received less than a reasonably equivalent value from the Defendants in

exchange for the Constructive Fraudulent Transfers.

189.   At the time the Constructive Fraudulent Transfers were executed, Prime was

(i) insolvent; (ii) engaged in business or a transaction, or was about to engage in a transaction, for

which its remaining property represented unreasonably small capital; or (iii) intending to incur, or

believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

190.   Each of the Constructive Fraudulent Transfers is subject to avoidance within the

meaning of Section 548(a)(1)(B) of the Bankruptcy Code.

## Count III
### Recovery of Avoided Transfers from the Defendants, 11 U.S.C. § 550

191.   Prime repeats and re-alleges each and every allegation in the preceding paragraphs

as if set forth fully herein.

192.   Prime is entitled to avoid the Preferential Transfers and/or the Constructive

Fraudulent Transfers described above pursuant to sections 547(b) and/or 548 of the Bankruptcy

Code.  Defendants were the initial transferees of such transfers, or the immediate or mediate transferees of such initial transferees, or the persons for whose benefit such transfers were made.

193.    Accordingly, Prime is entitled to recover from Defendants the Preferential Transfers of not less than $9,182,553.49 USD, or in the alternative, the Constructive Fraudulent Transfers of not less than $9,913,104.14 USD, pursuant to section 550 of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

### Count IV
### Claim Objection, 11 U.S.C. § 502

194.    Prime repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

195.    If and to the extent Defendants were the initial transferees of the Preferential Transfers and/or the Constructive Fraudulent Transfers, or the immediate or mediate transferees of such initial transferees, or the persons for whose benefit the Preferential Transfers and/or the Constructive Fraudulent Transfers were made, Prime is entitled to avoid the Preferential Transfers and/or Constructive Fraudulent Transfers described above pursuant to sections 547(b) and/or 548 of the Bankruptcy Code, which are recoverable from the Defendants under section 550 of the Bankruptcy Code.  Pursuant to section 502(d) of the Bankruptcy Code, in the event Defendants are liable for any avoidable transfer under sections 547(b) and/or 548 of the Bankruptcy Code, any claim(s) of the Defendants against the Debtors (regardless of whether or not the claim(s) were assigned) must be disallowed unless the Defendants pay the amount of the Preferential Transfers and/or the Constructive Fraudulent Transfers.

196.    Pursuant to section 502(d) of the Bankruptcy Code, any clam(s) of the Defendants against the Debtors (regardless of whether the claim(s) were assigned) must be disallowed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

A.    Enter an order finding that the Preferential Transfers are avoidable transfers under 11 U.S.C. § 547 and/or that the Constructive Fraudulent Transfers are avoidable transfers under 11 U.S.C. § 548;

B.    Granting judgment in favor of Plaintiff pursuant to 11 U.S.C. § 550 in an amount of the Preferential Transfers of not less than $9,182,553.49 USD, or in the alternative, in an amount of the Constructive Fraudulent Transfers of not less than $9,913,104.14 USD, plus the value of any additional avoidable transfers made to or for the benefit of Defendants during the Preference Period that Plaintiff learns about, through discovery or otherwise;

C.    Awarding Plaintiff attorneys' fees, pre- and post-judgment interests, and costs of suit;

D.    Disallowing, pursuant to 11 U.S.C. § 502(d), any claim(s) of the Defendants against the Debtors (regardless of whether or not the claim(s) were assigned), unless the amount of any judgment for avoidance of the Preferential Transfers and/or the Constructive Fraudulent Transfers is paid in full to Plaintiff; and

E.    Granting Plaintiff all other relief, at law or equity, to which it may be entitled.

Dated:  November 21, 2024
        Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

*/s/Maris J. Kandestin*
Maris J. Kandestin (No. 5294)
David R. Hurst (No. 3743)

1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:      mkandestin@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:      dazman@mwe.com
            jbevans@mwe.com
            ggriffith@mwe.com
            pkennedy@mwe.com
            jaminov@mwe.com

*Counsel to the PCT Litigation Trust*